UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RICHARD K., in his capacity as
legal guardian of L.K.,[1]

                                      Plaintiff,                  DECISION AND ORDER

-vs-

                                                                1:20-CV-1165 (CJS)

COMMISSIONER OF SOCIAL SECURITY,

                                Defendant.

_____

## INTRODUCTION

In August 2020, Kim H. ("Claimant") filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Commissioner of Social Security's ("Commissioner") denial of her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits. Compl., Aug. 28, 2020, ECF No. 1. Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Pl.'s Mot., July 30, 2021, ECF No. 15; Def.'s Mot., Dec. 29, 2021, ECF No. 17. While the matter was pending, however, Claimant died of respiratory failure due to COVID-19. Mot. to Substitute (Ex. 2), Aug. 1, 2022, ECF No. 21-1. Thereafter, the Court granted an amended motion to substitute party naming Richard K., legal guardian of Claimant's son, L.K, as the Plaintiff in this action. Order, Sept. 27, 2023, ECF No. 27.

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

For the reasons set forth below, Plaintiff's motion for judgment on the pleadings [ECF No. 15] is denied, the Commissioner's motion [ECF No. 17] is granted, and the Clerk of Court is directed to close this case.

## BACKGROUND

The Court assumes the reader's familiarity with the facts and procedural history in this case, and therefore addresses only those facts and issues which bear directly on the resolution of the motions presently before the Court.

<u>Plaintiff's Original Application and the ALJ's First Decision</u>

The DIB and SSI applications Claimant filed in 2014 alleged a disability onset date of August 2012. Transcript ("Tr."), 288,[2] Mar. 24, 2021, ECF No. 12. She stated that multiple sclerosis and dyslexia limited her ability to work. Tr. 476. After the Commissioner denied her applications, Claimant appeared with counsel on December 5, 2016 for a hearing before an Administrative Law Judge ("ALJ"). Tr. 242. In her opening statement, counsel argued that Claimant's main impairments were multiple sclerosis, anxiety, depression, and a wrist condition called stenotic tenosynovitis that prevents her from using her hands. Tr. 247. Counsel also stated that Claimant had several non-severe impairments that contributed to her inability to work, including asthma, hypothyroidism, and dyslexia. Tr. 247.

With respect to her education and work history, Claimant testified that she graduated high school, but that due to her dyslexia she only achieved a sixth grade reading level. Tr. 254–55. After high school, Claimant worked as a hotel receptionist and in a collections call center. Tr. 256. She "started having a lot of trouble" after she was

---

[2] The page references from the transcripts are to the bates numbers inserted by the Commissioner, not the pagination assigned by the Court's CM/ECF electronic filing system.

diagnosed with multiple sclerosis, and was eventually terminated from the call center for missing too much work. Tr. 256. Claimant tried to get back into the work force as a hostess at a restaurant, and then as a daycare assistant making lunches for the children, but was continually out of work once the daycare ceased operations in 2011. Tr. 258–59.

Claimant testified that her health worsened in August 2012, when she began "to drop things," and get bad headaches and a shooting pain down her back, arm, and leg, and tingling in her feet. Tr. 261. The condition would come and go; sometimes she would experience it for just a couple of days and then be back to normal, and other times it would last for a week. Tr. 262. She stated that the multiple sclerosis had gotten worse since 2012, and that she often had trouble taking showers, or even getting out of bed. Tr. 263. Claimant also stated that her physical condition deepened her depression, that she became angry more often, and got sad "a lot." Tr. 266. She required her daughter's help to go grocery shopping (Tr. 279), preferred not to drive (Tr. 280), and had to stop for breaks frequently when she mowed the grass or planted flowers (Tr. 277, 283).

In April 2017, the ALJ issued a decision finding that Claimant did not have a disability under the law, and therefore did not qualify for DIB or SSI benefits. Tr. 22. Claimant sought review of the ALJ's decision, and the parties ultimately stipulated before this Court to a reversal pursuant to sentence four of 42 U.S.C. § 405(g). Tr. 1060–62. As a result, the case was remanded to the Commissioner's Appeals Council, which vacated the decision and remanded the case back to the ALJ to "offer [Claimant] the opportunity for a hearing, address the evidence which was submitted to the Appeals Council, [and] take any further action needed to complete the administrative record and issue a new decision." Tr. at 1065–66.

The ALJ's Second Decision

Claimant's second hearing before the ALJ was held in April 2020, and due to the COVID-19 pandemic was conducted by teleconference. Prior to the hearing, Claimant brought the administrative record up to date by submitting additional medical records from multiple providers. At the hearing, Claimant's counsel maintained that Claimant had several severe impairments: multiple sclerosis, mild cognitive impairment, depression, anxiety, dyslexia, headaches, tachycardia, chronic hand issues, and stiffness. Tr. 942. Claimant testified that she was living with her mother and her eight-year-old son (Tr. 945), that she and her mother alternated days cooking for each other (Tr. 945–46), and that she was able to do the laundry but had to have someone else carry the basket of clean clothes back upstairs (Tr. 946). She had her driver's license taken away, and thereafter her sister had to take her to medical appointments and grocery shopping. Tr. 948, 961. Claimant testified that she had recently taken a job working part-time at a local elementary school as a substitute cafeteria worker, wiping down tables and working in the kitchen, but that she could not go full time because it would be too much on her legs and body. Tr. 949, 953.

Claimant stated that her multiple sclerosis had continued to worsen. She said that she experienced "flare-ups" at least once a week in which she got bad headaches, numbness in her body, tingling in her feet, shaky hands, and "jerks" or tremors in her legs and arms. Tr. 953–54. Claimant testified that she tried to walk two miles each day, but "not a straight walk, non-stop," because she had to keep stopping. Tr. 967.

The ALJ also took testimony from an impartial vocational expert (VE) at the hearing. Based on the ALJ's hypotheticals, the VE ruled out Claimant's past work as a hotel clerk and a collections clerk, but identified three positions involving sedentary work that Claimant could perform and that existed in sufficient numbers in the national economy. Tr. 974–76. The VE affirmed that an individual who would be off task for more than 10% of the day, or absent more than once a month, would be precluded from all competitive full-time employment. Tr. 977.

On May 5, 2020, the ALJ issued a decision which again found that Claimant did not have a disability under the law, and again denied Claimant's claims for DIB and SSI benefits. Tr. 926. To begin with, for the purposes of DIB benefits, the ALJ found that Claimant met the insured status requirements of the Social Security Act through December 31, 2016. Tr. 909. At step one of the Commissioner's "five-step, sequential evaluation process,"[3] the ALJ found that Claimant had not engaged in substantial gainful activity since the alleged disability onset date. Tr. 909. At step two, the ALJ determined

---

[3] Claimants must meet the insured status requirements of the Social Security act to be eligible for DIB benefits. *See* 42 U.S.C. § 423(c); 20 C.F.R. § 404.130. In addition, the Social Security Administration has outlined a "five-step, sequential evaluation process" that an ALJ must follow to determine whether a claimant has a "disability" under the law:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. § 404.1520(a)(4)(i)–(v), § 416.920(a)(4)(i)–(v)). The claimant bears the burden of proof for the first four steps of the process. 42 U.S.C. § 423(d)(5)(A); *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). At step five, the burden shifts to the Commissioner only to demonstrate that there is other work in the national economy that the claimant can perform. *Poupore v. Asture*, 566 F.3d 303, 306 (2d Cir. 2009).

that Claimant had the following severe impairments: asthma, multiple sclerosis, dyslexia, mild cognitive impairment / learning disability, major depressive disorder, generalized anxiety disorder, and hand tenosynovitis. Tr. 910. In addition, he found that Claimant's medically determinable impairments of tachycardia, hypothyroidism, hyperlipidemia, blurred vision, and hurt left shoulder were non-severe. Tr. 910. At step three, the ALJ found that the severity of Claimant's mental impairments did not meet or medically equal the criteria of listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 19–20. At steps two and three, the ALJ also performed the "special technique" required under 20 C.F.R. § 404.1520a for all mental impairments[4] and found that Claimant had moderate limitations in understanding, remembering or applying information, and in concentrating, persisting, or maintaining pace; and mild limitations in interacting with others, and adapting or managing herself. Tr. 912–13.

---

[4] When a claimant alleges a mental impairment, the Commissioner's regulations require the ALJ to apply a "special technique" at the second and third steps of the five-step evaluation process. *Petrie v. Astrue*, 412 F. App'x 401, 408 (2d Cir. 2011) (citing 20 C.F.R. § 404.1520a). First, the ALJ must evaluate the claimant using "Paragraph A" criteria to evaluate the claimant's pertinent symptoms, signs, and laboratory findings and determine whether he or she meets the requirements of one of the mental impairments listed in 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00 ("App'x 1, § 12.00"). *See* 20 C.F.R. § 404.1520a(b)(1). If the claimant does have such an impairment, the ALJ must assess the claimant's limitations in four broad areas of mental functioning that constitute the Paragraph B criteria: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself (collectively, the "Paragraph B criteria"). 20 C.F.R. § 404.1520a(c)(3).

The ALJ must rate the degree of the claimant's limitation in each of the Paragraph B criteria using a five-point scale: none, mild, moderate, marked, or extreme. 20 C.F.R. § 404.1520a(c)(4). To satisfy the "Paragraph B" criteria, a claimant's mental disorder must result in extreme limitation of one, or marked limitation of two, of the four criteria. App'x 1, § 12.00F(2). After rating the degree of functional limitation resulting from the claimant's mental impairment(s), the ALJ must then determine the severity of the mental impairment(s). 20 C.F.R. § 404.1520a(d).

Then, before proceeding to step four, the ALJ carefully considered the entire record and determined that Claimant had the residual functional capacity[5] ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and § 416.967(a), with the following limitations:

> [She] can occasionally climb ramps and stairs. She can occasionally stoop and bend, but she cannot kneel, crouch, or crawl. She cannot climb ladders, ropes, or scaffolds. She cannot perform work at unprotected heights. She cannot perform work requiring balance activities on uneven ground or slopes or on one leg. The claimant can occasionally perform overhead reaching, and she can frequently finger. She must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and other respiratory irritants. She cannot operate foot controls. She cannot have exposure to extreme heat or cold. Ambulation must be performed with the use of a cane, and the claimant can carry small files or folders in the non-cane hand. The claimant can understand, remember and carry out simple instructions and tasks. She cannot perform supervisory duties, no independent decision-making, and she can tolerate minimal changes in work routine and processes.

Tr. 913–14.

Based on this RFC, on Claimant's age and education, and on the testimony of the impartial VE, the ALJ found at step four that Claimant was not capable of performing her past relevant work as a hotel clerk or collections clerk, but that there were jobs in significant numbers in the national economy that she could perform, such as an addresser, a call out operator, or a telephone quotation clerk. Tr. 925. Hence, the ALJ concluded that Claimant was *not* disabled. Tr. 926.

---

[5] "Residual functional capacity" ("RFC") means the most that the claimant can still do in a work setting despite the limitations caused by the claimant's impairments. 20 C.F.R. § 404.1545, § 416.945.

As indicated above, Claimant filed the instant challenge to the Commissioner's decision in August 2020, but died while the matter was pending. Although Claimant's challenge initially involved the rulings on both the DIB and the SSI applications, in a prior decision and order the Court found that Claimant's SSI claim did not survive her death. Dec. and Order, 2–3, Aug. 19, 2022, ECF No. 23 (citing 20 C.F.R. § 416.542(b)). Consequently, the only remaining claim relates to Claimant's eligibility for DIB benefits.

## LEGAL STANDARD

Under 42 U.S.C. § 423(d), a claimant is disabled and entitled to disability insurance benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months.'" 42 U.S.C. § 405(g) defines the process and scope of judicial review of the Commissioner's final decision as to whether a claimant has a disability that would entitle him or her to an award of benefits. The fourth sentence of § 405(g) empowers the reviewing court to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." The sixth sentence authorizes the reviewing court to "order additional evidence to be taken before the Commissioner of Social Security . . . upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *See Tirado v. Bowen*, 842 F.2d 595 (2d Cir. 1988).

"The entire thrust of judicial review under the disability benefits law is to ensure a just and rational result between the government and a claimant, without substituting a court's judgment for that of the [Commissioner], and to reverse an administrative determination only when it does not rest on adequate findings sustained by evidence having rational probative force." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (internal citation and quotation marks omitted). Therefore, it is not the reviewing court's function to determine *de novo* whether the claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012). Rather, "[t]he threshold question is whether the claimant received a full and fair hearing." *Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018). Then, the reviewing court must determine "whether the Commissioner applied the correct legal standard[s]." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). Provided the claimant received a full and fair hearing, and the correct legal standards are applied, the court's review is deferential: a finding by the Commissioner is "conclusive" if it is supported by "substantial evidence." 42 U.S.C. § 405(g).

"Whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal citation and quotation marks omitted). Consequently, once an ALJ finds facts, a reviewing court can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (internal citation omitted).

DISCUSSION

Plaintiff is now before the Court seeking reversal or remand of the Commissioner's decision denying Claimant's DIB benefits. Plaintiff maintains that the ALJ erred by rejecting the opinion of Claimant's treating nurse practitioner, Donna Conway ("NP Conway"), and that Claimant was harmed by this error because the nurse practitioner's opinion indicated that Claimant could not use her hands or her fingers, or reach for more than a third of the workday. Pl. Mem. of Law at 13–19.

<u>Nurse Practitioner Conway's Opinion Evidence</u>

As the ALJ noted in his second decision denying benefits, NP Conway of the Hertel Elmwood Internal Medicine Clinic provided Claimant with primary care treatment "throughout the relevant time period in question." Tr. 915. Indeed, the ALJ devoted two full paragraphs of his decision to a recitation of the various signs and findings from NP Conway's longitudinal treatment records. Tr. 917. He described NP Conway's examinations of Plaintiff in August 2012, August 2013, February 2014, March 2014, August 2014, September 2014, February 2015, August 2015, May 2017, June 2017, September 2017, July 2018, September 2018, March 2019, and October 2019. Tr. 916–917. Based on the records from these examinations, the ALJ concluded:

> NP Conway's longitudinal treatment records from 2012 through October 2019 do not include signs and findings to suggest that the claimant is unable to perform the above range of simple, sedentary exertion work tasks. NP Conway has generally found the claimant to appear with normal musculoskeletal strength and range of motion, with no weakness or tenderness, and the claimant's mood and affect have stabilized with medication. Although the claimant had periodically presented with weak handgrip, pain and swelling in her hands, or reduced foot reflexes, these findings have not been sustained, and the above residual functional capacity accounts for such findings and the claimant's subjective reports with a limitation to sedentary exertion with postural, environmental, and manipulative restrictions. The repeated unremarkable examination findings

support my conclusion that greater functional limitations are not warranted. Tr. 917.

Following his review of the objective evidence, the ALJ then provided a thorough assessment of the opinion evidence. As part of that effort, the ALJ assessed a questionnaire that NP Conway filled out in June 2017 regarding Claimant's physical residual functional capacity. Tr. 922. On the questionnaire, NP Conway indicated diagnoses of multiple sclerosis, depression, and hypothyroidism, and listed Claimant's prognosis as "fair." Tr. 1384. She noted the multiple sclerosis was diagnosed in 2005, but that symptoms had gotten worse since 2012. Tr. 1384. NP Conway observed that Claimant experiences left arm and feet pain constantly, fatigue, sensitivity to light, and an inability to concentrate. Tr. 1384. She estimated that Claimant could only walk for half a block without severe pain, could not sit or stand for too long, needed to elevate her feet while sitting, could lift 10 pounds only rarely, and could never lift heavier weights. Tr. 1386. She indicated her belief that Claimant could use her hands to grasp, turn, or twist objects only 6% to 33% of an 8-hour workday, could use her fingers for fine manipulations less than 5% of the workday, and could use her arms for reaching only 5% of the workday. Tr. 1387. Consequently, NP Conway concluded that Claimant would not be able to sustain full-time employment at any exertional level. Tr. 1388.

The ALJ gave "little weight" to NP Conway's opinion. Tr. 923. He stated that although NP Conway had examined Claimant on numerous occasions as her primary care provider, NP Conway's "opinion is not supported by or consistent with her own examination findings or the examination findings from other sources." Tr. 923. The ALJ noted that NP Conway had examined Claimant two weeks prior to completing

questionnaire, and approximately three months afterward, and that though the examinations revealed some limitation, neither was consistent with the significant functional limitations she listed on the questionnaire. Tr. 923. The ALJ found similar inconsistencies between NP Conway's opinion, and contemporaneous medical records from University Neurology. Tr. 923. In addition, the ALJ noted that NP Conway's opinion was not consistent with the activities of daily living that Claimant testified about at her hearing, such as daily walking, part-time work as a cafeteria helper, and sharing the cooking and laundry work at home. Tr. 923.

Legal Principles

In cases such as the present, in which the claim was filed before March 27, 2017, "the opinion of a claimant's treating physician . . . is given controlling weight so long as it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence in the claimant's case record." *Schillo v. Kijakazi*, 31 F.4th 64, 75 (2d Cir. 2022) (citing *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); 20 C.F.R. § 404.1527(c)(2)). By contrast, a treating nurse practitioner is not necessarily entitled to such deference because a nurse practitioner is not an "acceptable medical source," and therefore cannot offer a "medical opinion" under the relevant regulations. 20 C.F.R. § 404.1502(a), § 404.1527(a)(1). *See also Monette v. Colvin*, 654 F. App'x 516, 518 (2d Cir. 2016). Rather a nurse practitioner's opinion is considered as an opinion from "a medical source who is not an acceptable medical source" to be evaluated under 20 C.F.R. § 404.1527(f).

§ 404.1527(f)(1) provides that an ALJ considering an opinion from a medical source who is not an accepted medical source must consider these opinions using the same factors as with medical opinions, including, length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, consistency of the opinion with the record as a whole, and whether or not the source is a specialist. § 404.1527(c)(1)–(6). The regulation is clear, however, that "not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source . . . depends on the particular facts in each case." Further, § 404.1527(f)(2) requires only that the ALJ "generally should explain the weight given to opinions [of nurse practitioners] or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."

<u>Application to NP Conway's Opinion</u>

With these principles in mind, the Court finds no error in the ALJ's treatment of NP Conway's opinion. Although NP Conway is a medical source with a treatment relationship with Claimant, she could not offer a "medical opinion" as "an acceptable medical source" under the relevant regulations. Accordingly, the ALJ was required only to explain the weight given to her opinion, or otherwise ensure that the discussion of the evidence in the determination or decision allowed the Court to follow the ALJ's reasoning. 20 C.F.R. § 404.1527(f)(2).

The ALJ satisfied that requirement. As indicated above, the ALJ explained that he gave "little weight" to NP Conway's June 2017 opinion because the limitations identified in the questionnaire were not consistent with (1) NP Conway's examination notes from March and September of 2017, (2) examination notes from University Neurology around the same time period, or (3) Claimant's testimony about her activities of daily living. Tr. 923. Moreover, this explanation, along with the ALJ's lengthy recitation of the objective evidence from "NP Conway's longitudinal treatment records from 2012 through October 2019," was more than sufficient to allow Plaintiff and the Court "to follow the adjudicator's reasoning . . . ." 20 C.F.R. § 404.1527(f)(2).

Not only was the Court able to follow the ALJ's reasoning, but, after reviewing the record, the Court finds that the ALJ's conclusion was supported by substantial evidence. For instance, Claimant was examined by Nurse Practitioner Beth Tacca of University Neurology on July 31, 2017, approximately one month after NP Conway's opinion. Tr. 1689–95. Although Claimant reported a multitude of worsening symptoms and high stress from her mother's hospitalization (Tr. 1689), the examination notes reflect that she appeared in "no acute distress," with a normal range of motion, normal motor strength in "all muscle groups," normal "motor tone" (on the "Tremor Exam"), normal "finger taps" on both hands, normal hand opening and closing, and a normal gait. Tr. 1692–93. Claimant did show some decrease in "vibratory sensation" in the toes of both feet, and heel taps mildly slowed. Tr. 1692–93. These examination findings were almost identical when NP Tacca examined Claimant again in November 2017. Tr. 1685–86. In addition, Claimant testified at her second hearing before the ALJ that she did most of the cooking and cleaning when her mother was sick (Tr. 964–65), that she tried to go for daily walks of up

to two miles (Tr. 967), and that she worked a part-time position as a cafeteria worker in an elementary school. (Tr. 954–957).

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Plaintiff's motion for judgment on the pleadings [ECF No. 15] is denied, and the Commissioner's motion for judgment on the pleadings [ECF No. 17] is granted. The Clerk of Court is directed to close this case.

DATED:    September 28, 2022
          Rochester, New York

*Charles J. Siragusa*
CHARLES J. SIRAGUSA
United States District Judge